# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| **Steven R. Zang, and all others similarly situated**<br><br>Plaintiffs,<br><br>**v.**<br><br>**Paychex, Inc.**<br><br>Defendant. | **Case No.:2:07-CV-13410**<br>**Hon. John Feikens** |

## PLAINTIFF'S OPPOSITION TO PAYCHEX, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... i

ISSUES PRESENTED ......................................................................................... iii

CONTROLLING AND MOST APPROPRIATE AUTHORITIES ........................... iv

TABLE OF AUTHORITIES ................................................................................... v

INTRODUCTION ................................................................................................ 1

FACTUAL SUMMARY ....................................................................................... 3

    A.   Paychex Pension Plan Products And Services ...................................... 3

    B.   Paychex Determines Which Mutual Funds Are Available To Client Plans ............. 4

    C.   Mutual Funds Make Revenue Sharing Payments To Paychex So That Paychex Will Offer The Mutual Funds To Paychex's Client Plans ................................. 5

    D.   Paychex Controls Plan Assets .......................................................... 7

ARGUMENT ...................................................................................................... 9

    I.   STANDARD OF REVIEW ........................................................... 9

    II.   ZANG'S CLAIMS ARE NOT TIME-BARRED ............................... 10

        A.   Legal Standard .................................................................... 10

        B.   Zang Did Not Know More Than Three Years Prior To Filing Suit That Paychex Selected Mutual Funds Based On Its Own Interests. .......................... 11

        C.   Zang Did Not Know More Than Three Years Prior To Filing Suit That Defendant Failed To Properly Manage Plan Assets ........................... 14

    III.   PAYCHEX IS A FIDUCIARY BECAUSE IT CONTROLS PLAN ASSETS ... 15

        A.   Function Is Key To Fiduciary Status. ....................................... 15

B.    Fiduciary Status Is A Fact-Intensive Inquiry Unsuitable For Disposition On A Motion To Dismiss ........................................................................................ 17

C.    Paychex Is A Fiduciary Because It Controls Plan Assets ........................... 17

CONCLUSION ........................................................................................................... 23

## **ISSUES PRESENTED**

1. Did Plaintiff Zang have actual knowledge of Paychex, Inc.'s ("Paychex") breaches of fiduciary duty more than three years before he filed his complaint where Zang did not know (1) that Paychex selected mutual funds for pension plan investments based on the fee-generating interests of Paychex rather than based on the best interests of Paychex's pension plan clients, (2) how much Paychex received in revenue sharing payments from mutual funds, or (3) that Paychex's statements that mutual fund revenue sharing payments to Paychex were for various services to mutual funds and pension plan clients were not true?

2. Can this Court determine whether Zang had "actual knowledge" on the record before it on a motion to dismiss?

3. If taken as true, do Plaintiff Zang's allegations that Paychex controlled pension plan assets by (1) having some control over the selection of mutual funds available to pension plans and receiving compensation from mutual funds in which the Plan invests, and (2) controlling how long pension plan assets are held in a pooled trust account before those assets are invested in mutual funds and receiving earnings from the trust account based on how long pension plan assets are held therein state that Paychex functioned as a fiduciary under ERISA?

4. Is Paychex's fiduciary status a fact-intensive inquiry that cannot be resolved on a motion to dismiss?

<u>**CONTROLLING AND MOST APPROPRIATE AUTHORITIES**</u>

**I.**     **STANDARD OF REVIEW**

*Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007)

*NicSand, Inc. v. 3M Co.*, --- F.3d ----, 2007 WL 3010426, at * (6th Cir. 2007)

**II.**    **ZANG'S CLAIMS ARE NOT TIME-BARRED**

*Wright v. Heyne*, 349 F.3d 321, 322 (6th Cir. 2003)

**III.**   **PAYCHEX IS A FIDUCIARY BECAUSE IT CONTROLS PLAN ASSETS.**

    **A.**     **Function Is Key To Fiduciary Status.**

        *Briscoe v. Fine*, 444 F.3d 478, 492-93 (6th Cir. 2006)

        *IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997)

        *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999)

    **B.**     **Fiduciary Status Is A Fact-Intensive Inquiry Unsuitable For Disposition On A Motion To Dismiss.**

        *Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003)

    **C.**     **Paychex Is A Fiduciary Because It Controls Plan Assets.**

        *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006)

        *Phones Plus, Inc. v. The Hartford Fin. Servs. Group, Inc.*, 2007 WL 3124733, *4 (D. Conn. 2007)

        DOL Adv. Op. 97-16A (May 22, 1997)

## TABLE OF AUTHORITIES

**Cases**

*Bd. Of Trustees Of Bricklayers And Allied Craftsmen Local 6 Of New Jersey Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 273 (6th Cir. 2001) ...................................................................... 16

*Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996) .................................................... 9

*Briscoe v. Fine*, 444 F.3d 478, 492-93 (6th Cir. 2006)....................................................... 15, 16, 17

*Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856 (8th Cir. 1999).................................................... 11

*Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2d Cir. 2001) ..................................................................... 11

*Chao v. Emerald Capital Mgmt. Co.*, 2006 WL 2620055 (W.D.N.Y. Sept. 13, 2006).......... 11, 17

*Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007) ................................................................................................................................................ 22

*DeLuca v. Blue Cross Blue Shield of Mich.*, No. 06-12552 (E.D. Mich. Oct. 31, 2007) ....... 17, 22

*Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 703 (W.D. Mich. 2007) ........................ 15, 17

*Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) .......................................................................... 9

*Fink v. Nat'l Sav. and Trust, Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985)........................................ 10

*Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006).................... 19, 21

*In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002, 1015 (S.D. Ohio 2006) ....... 10, 15, 17

*In re General Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, at *5 (E.D. Mich. Apr. 6, 2006) ................................................................................................................................................ 11

*IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997) .................................... 15

*Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007) ..................................................................... 9

*Mertens v. Hewitt Assoc.,* 508 U.S. 248, 262 (1993).................................................................... 15

*NicSand, Inc. v. 3M Co.*, --- F.3d ----, 2007 WL 3010426, at * (6th Cir. 2007).............................. 9

*Phones Plus, Inc. v. The Hartford Fin. Servs. Group, Inc.*, 2007 WL 3124733, *4 (D. Conn. 2007) ................................................................................................................................. 18, 19, 21

*Rankin v. Rots*, 278 F. Supp. 2d 853, 879 (E.D. Mich. 2003) ...................................................... 17

*Seaway Food Town, Inc., v. Med. Ass'n of Ohio*, 347 F.3d 610 (6th Cir. 2003) ...................... 17, 22

*Sherrill v. Federal-Mogul Retirement Programs Committee*, 413 F. Supp. 2d 842, 857 (E.D. Mich. 2006) ................................................................................................................................. 11

*Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir.1997) .................................................................. 9

*Wright v. Heyne*, 349 F.3d, 321, 322 (6th Cir. 2003) ................................................ 1, 10, 11, 13

*Wysong v. Dow Chem. Corp.*, 503 F.3d 441, 2007 WL 2819880 (6th Cir. 2007) ......................... 9

**Statutes**

29 U.S.C. § 1002(21) ..................................................................................................................... 15

29 U.S.C. § 1113(a) ....................................................................................................................... 10

29 U.S.C. § 1113(b) ....................................................................................................................... 10

29 U.S.C. §§ 1001 ........................................................................................................................... 1

ERISA § 3(21) ................................................................................................................................ 15

**Rules**

ERISA Procedure 76-1 §§3, 10, 41 ................................................................................................ 18

Fed. R. Civ. P. 8(a)(2) ..................................................................................................................... 8

**Regulations**

DOL Adv. Op. 97-16A (May 22, 1997) ............................................................... 17, 18, 19, 21

**INTRODUCTION**

Plaintiff Steven R. Zang ("Zang") has sued Defendant Paychex, Inc., ("Paychex") on behalf of the Luxon & Zang PC 401(k) Profit Sharing Plan & Trust ("Plan"), and all other similarly situated plans (some 38,000 small businesses that contract with Paychex to provide 401(k) plan services).

Zang, the trustee and sponsor of the Plan, alleges that Paychex breached its fiduciary duties under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.*, by, among other things, placing its own fee-generating interests ahead of those of its client plans and entering into numerous prohibited transactions with mutual funds and banks for the benefit of Paychex and those entities.  Paychex's breaches of fiduciary duty and prohibited transaction caused the Plan to pay excessive and unnecessary fees and forego better investment returns.

Paychex has moved to dismiss Zang's complaint on two grounds:  (1) Zang's claims are barred under ERISA's statute of limitations because Zang purportedly had "actual knowledge" of all the facts necessary to file this lawsuit more than three years ago; and (2) Paychex is not a fiduciary under ERISA.  The Court should deny Paychex's motion.

Paychex cannot establish that Zang had "actual knowledge" more than three years ago of the essential facts and transactions supporting his claims for relief at this stage of the proceedings.  The courts of the Sixth Circuit have spoken clearly on this question.  In *Wright v. Heyne*, 349 F.3d, 321, 322 (6th Cir. 2003), the leading authority, the Court decided "actual knowledge" after discovery of what plaintiff knew and when he knew it.  Moreover, the limited record before the Court does not support a finding of actual knowledge.  Paychex relies entirely on various contracts signed by Zang that, according to Paychex, told Zang about Paychex's revenue sharing arrangements more than three years before he filed his complaint.  The mere

receipt of revenue sharing, however, is not a self-evident breach of duty and the documents do not disclose all the essential facts and transactions that make up the breaches of duty.  The documents do not disclose that Paychex selected those mutual funds willing to pay-to-play as opposed to those mutual funds that were best for Paychex's pension plan clients.  The documents do not disclose that Paychex received tens of millions of dollars from revenue sharing.  The documents represent that revenue sharing payments reduce client plan administration costs and are payment for services rendered to client plans and mutual funds, when, in fact, revenue sharing payments are based solely on a percentage of assets under management and are payment for including a mutual fund on Paychex's menu of funds.  The documents do not disclose that Paychex used the market power of its pension plan client assets to increase its revenue-sharing receipts from 30 basis points in 2005 to 40 basis points in 2006.

Nor can Paychex prove it is not a functional fiduciary on the limited record before the Court.  Zang has alleged that Paychex *functions* as a fiduciary by exercising discretionary authority and control over Plan assets.  Determining whether a person *functions* as a fiduciary is a fact-intensive inquiry.  Paychex, however, would have the Court believe that the contracts between it and Zang (on behalf of the Plan), resolve the question in Paychex's favor because those documents say Paychex is not a fiduciary.  Likely Paychex's contracts and other documents were drafted by expert ERISA counsel to disclaim fiduciary status.  Artful drafting, however, does not trump *functional* fiduciary status.  If it were that simple, every fiduciary would simply draft documents saying "I'm not a fiduciary" while functioning as one without fear of being subjected to the strict standards of conduct required by ERISA.  Congress anticipated such gamesmanship and provided that a person could *function* as a fiduciary based on what he does, not on what documents say.  Paychex also argues that Zang's allegations that Paychex

functions as a fiduciary, even if accepted as true, do not establish fiduciary status.  Not so.  The *sine qua non* of fiduciary status is control over plan assets.  As Zang alleges in his complaint, Paychex exercises control over the Plan's assets by:  (1) controlling the menu of mutual funds available to the Plan and selecting mutual funds based on maximizing revenue sharing for Paychex instead of the best interests of pension plan clients; (2) controlling how long Plan assets are held in a pooled trust account before those assets are invested in mutual funds and receiving earnings from the trust account based on how long Plan assets are held therein; and (3) pledging Plan assets as collateral for lines of credit issued to Paychex.

## FACTUAL SUMMARY

### A.    Paychex Pension Plan Products And Services.

Paychex provides payroll, human resource and employee benefits services to small- to medium-size businesses in the United States.  (Compl. ¶ 2.)  Paychex offers its pension plan clients several so-called master or prototype plans, which are model pension plans with standardized plan documents (hereinafter "Prototype Plan").  (*Id.* ¶¶ 5, 28.)  Prototype Plans are essentially forms establishing virtually all of the terms of the pension plan.  (*Id.* ¶ 28.)  The plan sponsor (employer) chooses the Prototype Plan to adopt for its employees.  (*Id.* ¶ 29.)

When employers adopt a Prototype Plan, they also enter into Administrative Service Agreements with Paychex and its subsidiaries (all references herein to Paychex include its subsidiaries) whereby Paychex provides various compliance, reporting, administrative, and record-keeping services.  (*Id.* ¶ 6.)  Employers or plans pay Paychex directly for such services.  (*Id.* ¶¶ 6, 41.)  Paychex retains the discretion and reserves the right to unilaterally change the retirement services and the fees it charges for the services.  (*Id.* ¶ 30.)

3

**B.      Paychex Determines Which Mutual Funds Are Available To Client Plans.**

When a Paychex client adopts a Prototype Plan, the client (generally the employer or plan sponsor) selects the mutual funds that will be offered to participants in the plan from a menu of funds provided and determined by Paychex.  (Compl. ¶ 7.)  Every cost or expense to a mutual fund is ultimately born by Paychex client plans, which, like other mutual fund investors, bear the costs of managing and administering the fund.  (*Id.* ¶¶ 9, 58.)

Paychex determines which mutual funds to make available to its client plans.  (*Id.* ¶¶ 33, 39.)  Paychex also reserves the right to "modify" the list of mutual funds, that is, to delete, add or substitute mutual funds, made available to its client plans.[1]  Paychex conducts all negotiations with the mutual funds, financial services companies, and banks, including any negotiations regarding the fees paid to Paychex by a mutual fund, its affiliate, financial services company, or bank.  (Compl. ¶ 34.)  Paychex does not disclose to its pension plan clients the amount of revenue-sharing payments that it receives from mutual funds.  (*Id.* ¶¶ 11, 35.)  Instead, it tells its client plans that "there are no hidden fees."  (*Id.* ¶ 62.)  In addition, Paychex "assist[s] the Client to identify investment vehicles available for investment by the Plan"[2] while at the same time receiving revenue sharing payments from the mutual funds.

Paychex chooses mutual funds based on whether the fund will make revenue sharing payments to Paychex, not on the basis of the best interests of its pension plan clients.  (Compl. ¶¶ 59-60.)  As a consequence, pension plan clients are stuck with high-fee, low performance mutual funds and mutual fund share classes.  (*Id.* ¶¶ 42-57.)

---

[1] Index of Exhibits to Paychex, Inc.'s Motion to Dismiss Plaintiff's Complaint, Paychex Exs. E at 3, part V.A, and G at 4, ¶ 19.  Exhibits submitted by Paychex are hereinafter referred to as "Paychex Ex. XX."  When referring to the page of a Paychex Exhibit, plaintiff refers to the page number stamped on the top of the page by the Court's ECF system.

[2] Paychex Ex. D at 2.

4

C.     **Mutual Funds Make Revenue Sharing Payments To Paychex So That Paychex Will Offer The Mutual Funds To Paychex's Client Plans.**

In the various Administrative Services Agreements Paychex and Zang signed, Paychex represented that it receives "revenue sharing" payments from mutual funds (or mutual fund families) for providing record-keeping, transfer agent and shareholder servicing, marketing, and other administrative services.  (*Id.* ¶ 8; *see also* Paychex Ex. A at 32; Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17.)[3]  Paychex also says that the revenue sharing payments that it receives offset fees that its pension plan clients would otherwise have to pay.  (Paychex Ex. A. at 31; Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17.)  In fact, Paychex clients are paying twice for the record-keeping services that Paychex provides to pension plans and Paychex provides little or no services to mutual funds other than including mutual funds on its menu of available mutual funds, as explained below.  (Compl. ¶¶ 8-10.)

The Administrative Services Agreements say that revenue sharing payments are to compensate Paychex for record-keeping, transfer agent and shareholder servicing, marketing, and other administrative services.  (Compl. ¶ 8; *see also* Paychex Ex. A at 32; Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17.)  These various services fall into two categories—pension plan record-keeping services and mutual fund services.

According to Paychex, pension plan record-keeping services include:  testing to insure compliance with government regulations; enrolling new participants; providing investment information, *e.g.*, rates of return, account balances, and mutual fund prospectuses to the employer and to the participant; setting up and maintaining Internet-based online access to plan

---

[3] The earliest Administrative Services Agreement actually says that some of these services, without specifying which, are provided to the mutual funds.  (*See* Paychex Ex. A at 32.)  Subsequent Administrative Services Agreement are silent as to who the services are provided.  (*See* Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17.)

and individual account information for both the employer and participants; and debiting the employer's bank account for participants' contributions, electronic funds transfer, and other administrative services.  (Compl. ¶ 32; Paychex Ex. E at 2, Part II.A.)  Paychex pension plan clients pay Paychex directly for these record-keeping services.  (Compl. ¶ 41.)  And, as Paychex says, mutual funds also pay Paychex for record-keeping services through revenue sharing.  (*See* Paychex Ex. A at 32; Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17.)  Given that mutual fund revenue sharing payments are ultimately paid by mutual fund investors like the Plan (Compl. ¶¶ 44-45, 58), Paychex's pension plan clients are paying twice for the same record-keeping services (*Id.* ¶ 10).  Indeed, it is clear from Paychex's own documents that Paychex does not perform any record-keeping services for mutual funds above and beyond the record-keeping services that Paychex performs under contract to its pension plan clients.  (*See* Paychex Ex. A at 31 (mutual fund record-keeping services "duplicate" pension plan record-keeping services).)  In short, the record-keeping services provided to the mutual funds (if provided at all) are redundant and costly to the Plan.

The Administrative Services Agreements also say that Paychex receives revenue sharing payments for transfer agent, shareholder servicing and marketing services. (Paychex Ex. A at 32; Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17.)  These services purportedly are provided to mutual fund companies.  (Paychex Ex. A. at 31 (revenue sharing payments are for "services rendered to the [mutual] Funds.").)  In reality, mutual funds pay Paychex so that Paychex will make such mutual funds available to clients who adopt a Prototype Plan offered by Paychex, not for any shareholder or administrative services provided to the mutual funds. (Compl. ¶ 8.)  Thus, Paychex does not disclose the true purpose of the revenue sharing payments

and maintains sham agreements with mutual funds to hide its pay-to-play scheme with the mutual funds that make it onto Paychex's menu.

### D. Paychex Controls Plan Assets.

Paychex processes and invests contributions to the pension plans; maintains records of the contributions, earnings on the investments, withdrawals of investments, and other information relevant to the pension plan; makes disbursements and distributions from the mutual funds, the bank account maintained to hold pension plan contributions and withdrawals; and furnishes the plans and the participants with periodic plan account statements. (Compl. ¶ 36.)

Paychex has the discretion to determine which mutual funds are included in its 401(k) platforms and how much it will charge those mutual funds, and ultimately Paychex's client plans, to be included in the available investment offerings. (*Id.* ¶ 69; Paychex Exs. E at 3, part V.A, and G at 4, ¶ 19.) Paychex negotiates with mutual funds for the amount of revenue-sharing payments that it will receive, an amount ultimately paid by Paychex's client plans. Indeed, Paychex increased its revenue-sharing receipts from 30 basis points in 2005 to 40 basis points in 2006 without disclosing to its client plans that it increased the fees received from mutual funds, which increase was ultimately to be paid by those clients. (*Id.* ¶ 70.)

Paychex also receives money from the Plans' assets where it receives earnings on such assets deposited in Paychex controlled accounts, including bank depository accounts, pending investment in the mutual funds that Paychex chooses to make available to those clients who adopt its Prototype Plans. (*Id.* ¶¶ 13, 71.) Paychex has the sole discretion to select the financial institution and the type of account for the Master Trust Account. (*Id.* ¶ 71.) Paychex negotiated for the Master Trust Account to be a non-interest bearing account for Paychex pension plan clients so that Paychex would earn any interest or investment income while pension plan assets

were held in the Master Trust Account.  (*Id.* ¶ 72.)  Paychex also has sole discretion over how long its client plan assets remain in the Master Trust Account.  (*Id.*; Paychex Ex. A at 30, Part II.D (representing that Paychex may "normally" processes funds in five days, and it may take even longer.)  Thus, Paychex can increase its earnings by keeping those assets in the Master Trust Account to maximize income for Paychex, which reduces investment earnings opportunities for its pension plan clients.

Lastly, Paychex controls Plan assets by pledging those assets as security for lines of credit issued to Paychex.  Paychex pledges its pension plan clients' assets—mutual fund shares—for a line of credit from JP Morgan Chase Bank, N.A. to Paychex.  The line of credit is $350 million.[4]  Paychex's pledge of pension plan assets plainly evidences control over plan assets.

---

[4] Paychex 2007 Form 10-K Annual Report filed with the United States Securities and Exchange Commission on July 20, 2007 at page 21.  In ruling on a motion to dismiss, the Court "may consider … any matter subject to judicial notice, such as SEC filings."  *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2007).  For the Court's convenience, a true and correct copy of the 10-K is attached hereto as Exhibit 1.

## ARGUMENT

## I.    STANDARD OF REVIEW

A court "must read all well-pleaded allegations of the complaint as true"[5] and construe all allegations in the light most favorable to the plaintiff.[6]  Indeed, a plaintiff does not even need to plead specific facts to support his claim.[7]  And on a motion to dismiss, this Court must "construe the plaintiff's complaint liberally, in plaintiff's favor, accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff."  *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007).  Plaintiff Zang has alleged facts to support his claims for relief.  His complaint is not a bare-bone pleading, but a detailed recitation of the transactions and conduct supporting his various counts under ERISA.

"In considering a defendant's motion to dismiss, it is proper for the Court to take into account any relevant plan documents. Courts may consider ERISA plan documents not attached

---

[5] *Weiner v. Klais & Co.*, 108 F.3d 86, 88 (6th Cir.1997) (citing *Bower v. Fed. Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)).

[6] *Bower*, 96 F.3d at 203.

[7] *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).  Rather, Fed. R. Civ. P. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. ----, ----, 127 S. Ct. 1955 (2007).); *see also Wysong v. Dow Chem. Corp.*, 503 F.3d 441 (6th Cir. 2007) (citing *Erickson* for "short and plain statement" pleading standard and reversing trial court's ruling granting motion to dismiss).

As the Sixth Circuit has explained, *Bell Atlantic* is not a sea change in pleading standards:

> Although many commentators have intimated that *Bell Atlantic* represents a significant departure from prior law, the decision in fact makes simpler the task before us in this case.  In *Bell Atlantic*, the Court explained that "a plaintiff's obligation to provide the grounds of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Thus, *the key distinction is between a bare-bones complaint asserting only the elements of a claim and a complaint asserting not only legal elements, but also facts to support those elements*.  Courts are well-suited to distinguish between the two.  Indeed, we do so all the time when reviewing questions of fact, mixed questions of law and fact, and questions of law.  It is not a controversial assertion that, while a plaintiff need not assert detailed facts, a plaintiff must assert some facts.

*NicSand, Inc. v. 3M Co.*, --- F.3d ----, 2007 WL 3010426, at * (6th Cir. 2007) (emphasis added); *see also Midwest Media Property, L.L.C. v. Symmes Tp.*, 503 F.3d 456, 472 n. 3 (6th Cir. 2007) (observing that *Bell Atlantic* changed the pleading standards only "slightly," and that the plaintiff therein had simply asserted a "bare" violation of the Sherman Act without alleging *any* facts in support).

to a complaint where a plaintiff's claims are 'based on rights under the plans which are controlled by the plans' provisions as described in the plan documents' and where the documents are 'incorporated through reference to the plaintiff's rights under the plans, and they are central to plaintiff's claims.'" *In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002, 1015 (S.D. Ohio 2006) (citations omitted).  Here, the many exhibits submitted by Paychex in support of its motion to dismiss are not about Zang's rights under the Plan.  To the contrary, Zang complains about Paychex's conduct as a functional fiduciary, not about how Paychex performed under the various agreements between Paychex and Zang.  Further, Paychex's exhibits are authenticated by a declaration.  (*See* Paychex Exs. A-G.)  And what purports to be the current Administrative Services Agreement is not signed by anyone, let alone Zang.  (*See* Paychex Ex. G.)

## II.      ZANG'S CLAIMS ARE NOT TIME-BARRED

### A.      Legal Standard.

ERISA's statute of repose for breaches of fiduciary duty is six years from the acts or omissions constituting the breach, 29 U.S.C. § 1113(1), except the period is shortened to three years from the time the plaintiff "ha[d] actual knowledge of the breach or violation," 29 U.S.C. § 1113(2).

In *Wright v. Heyne*, 349 F.3d, 321, 322 (6th Cir. 2003), the Sixth Circuit interpreted what it means for an ERISA plaintiff to "have actual knowledge of [a] breach or violation."  The core holding of *Wright* is that the three-year period begins to run when the plaintiff has "actual knowledge of the underlying conduct giving rise to the alleged violation…."  *Id.* at 331.  The Sixth Circuit added that "'[t]he disclosure of a transaction that is not inherently a statutory breach of fiduciary duty cannot communicate the existence of the underlying breach.'"  *Id.* at 329 (quoting *Fink v. Nat'l Sav. and Trust, Co.*, 772 F.2d 951, 957 (D.C. Cir. 1985).

Actual knowledge depends on what the plaintiff actually knew (not should have or could have known) and when he knew it.  Thus the leading Sixth Circuit case, *Wright*, was decided on a motion for summary judgment.  Courts following *Wright* have observed that "[i]n *Wright*, the court rested its decision on an abundance of evidence about the process by which the plaintiffs discovered the defendant's wrongdoing--evidence no doubt developed during the discovery process."[8]  The cases cited by Paychex in support of its actual knowledge argument (*see* Memo at 8) also were decided at summary judgment.[9]  Thus Paychex's statute of limitations argument is premature.

### B.   Zang Did Not Know More Than Three Years Prior To Filing Suit That Paychex Selected Mutual Funds Out Of Self-Interest.

Paychex argues that Zang had actual knowledge of the breaches of fiduciary duty that he alleges more than three years ago because, according to Paychex, all the essential facts giving rise to the breaches of duty were contained in the various contracts and agreements that Zang signed.[10]  (Paychex, Inc.'s Memorandum Of Law In Support Of Its Motion To Dismiss Plaintiff's Complaint ("Memo") [DE No. 7-2], at 7-10.)  Not true.  The agreements that Zang signed do, indeed, reveal that Paychex engaged in transactions involving Plan assets with mutual funds and banks and that Paychex received compensation in connection with those transactions.  But revenue sharing per se does not form the basis of Zang's claim.  Rather, it is Paychex's conduct in selecting mutual funds or other financial institutions for the investment of Plan assets

---

[8] *In re General Motors ERISA Litig.*, No. 05-71085, 2006 WL 897444, at *5 (E.D. Mich. Apr. 6, 2006); *see Sherrill v. Federal-Mogul Corp. Retirement Programs Committee*, 413 F. Supp. 2d 842, 857 (E.D. Mich. 2006).

[9] *See Wright*, 349 F.3d 321; *Caputo v. Pfizer, Inc.*, 267 F.3d 181 (2$^{d}$ Cir. 2001) (incorrectly cited as 267 F.2d 181); *Chao v. Emerald Capital Mgmt. Ltd.*, 2006 WL 2620055 (W.D.N.Y. Sept. 13, 2006); *Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856 (8th Cir. 1999).

[10] In the event that the Court determines that Zang's knowledge of the existence of revenue sharing between Paychex and mutual funds is "actual knowledge" for purposes of ERISA § 413, plaintiff is prepared to add a Michigan participant in a Paychex Prototype Plan that has no knowledge of the various agreements that Zang signed.

that is the core issue.  Those facts are not revealed in the documents that Zang signed.  Consider what Zang actually alleges:

- Paychex represents that revenue-sharing reduces client plan administration costs and are payment for services rendered to client plans and mutual funds; in fact, revenue sharing payments are based solely on a percentage of assets under management and are payment for including a mutual fund on Paychex's menu of funds.  (Compl. ¶¶ 8, 45.)

- "Paychex *does not disclose* that it receives tens of millions of dollars in fees from its clients' plans' assets through revenue-sharing payments.  In fact, Paychex tells prospective customers that **'There are no hidden fees.'**"  (Compl. ¶ 62 (first emphasis added, second emphasis in Complaint).)

- "Paychex increased its revenue-sharing receipts from 30 basis points in 2005 to 40 basis points in 2006 *without disclosing to its clients* that it increased its fees from mutual funds…."  (*Id.* ¶ 70 (emphasis added).)

- "Paychex channeled the Plan (and its other plan clients) into mutual funds and a bank that, *unbeknownst to the Plan*, were paying Paychex more than $20 million a year…."  (*Id.* ¶ 84 (emphasis added) (*accord* ¶ 90).)

None of these facts were revealed in the agreements that Zang signed, so it defies logic to contend that Zang had the requisite knowledge to trigger ERISA's three-year limitations period.

In an effort to overcome Zang's allegations, Paychex reframes them to suit its argument, contending that Zang's complaint is about revenue sharing per se, not about Paychex's conduct in selecting mutual funds or other financial institutions for the investment of Plan assets.  (Memo at 10 ("Paychex disclosed to Mr. Zang it contracted for and received revenue sharing from mutual fund companies and JPMorgan Chase.").)  Thus, the argument goes, Zang knew the essential facts because the documents that he signed told him about revenue sharing.  (Memo at 9.)  Statements in documents that disclosed the existence of revenue sharing, however, do not

reveal that Paychex put its own interest in maximizing revenue sharing ahead of the Plan's interests in sound investments at a reasonable price.

The gravamen of Zang's complaint is that Paychex "steer[ed] client pension plan assets into a circumscribed set of mutual funds and a trust bank account *on the basis of whether* the mutual funds and bank were willing to make revenue-sharing and other payments to Paychex." (Compl. ¶ 84 (emphasis added).)  While Paychex represented to its pension plan clients that it performed necessary and valuable services to mutual funds and pension plans in exchange for revenue sharing payments (Paychex Ex. A at 32; Paychex Ex. E at 3, Part IV.C; Paychex Ex. G at 4, ¶ 17), Paychex, in fact, steered its pension plan clients to mutual funds and financial institutions on the basis of how much they would pay Paychex (Compl. ¶ 8.)  Zang also complains that this self-interested conduct resulted in higher fees and expenses as well as inferior investment performance.  (Compl. ¶¶ 10, 12, 58-64.)  Nothing in the documents that Zang signed reveals these facts.  Quite simply, Paychex cannot escape the fact that the disclosures it trumpets are completely silent on the core conduct about which Zang complains—that Paychex's selection of funds was corrupted by its own self interests.

Paychex's chief authority, *Wright*, 349 F.3d 321, provides scant support for its argument. The plaintiffs in *Wright* entered into various agreements in 1987 that fully disclosed that the defendant had a financial interest in Vestax, and that Vestax "would earn fees for the services it would provide" to plaintiffs' ERISA plan.  *Wright*, 349 F.3d at 323-24.  In 1992-95, plaintiffs were told by various investment consultants that the defendant's investment decisions "were 'driven by fees and commissions' and were 'not proper.'"  *Id.* at 324.  In other words, "the fees and commissions that [defendant] was earning [were] 'driving the choice of investment as opposed to the appropriateness of the investment.'"  *Id.*  The disclosures about what plaintiffs'

were told were "extrinsic facts" to the complaint. *Id.* at 331.  The Sixth Circuit held that the agreements themselves did not "'communicate the existence of an underlying breach,' [but rather] the extrinsic facts of which the Plaintiffs had actual knowledge" started the three year limitations period. *Id.* at 331.  The "extrinsic facts" were those which the plaintiffs learned in the 1992-95 timeframe – *i.e.* that defendant's actions were driven not by his fiduciary responsibilities, but rather by an interest in lining his own pockets. *Id.*  So the statute of limitations was not triggered by plaintiffs' knowledge of defendant's financial interest in the investment activities of the plan, but, rather, by knowledge that the defendant allowed self-interest to corrupt his decision making.

The same result should obtain here.  The agreements that Zang signed merely disclosed that Paychex might receive revenue sharing payments.  They do not disclose that Paychex selected mutual funds on the basis of how much a mutual fund would pay Paychex or that Paychex performed little or no services in exchange for revenue sharing payments.

### C.   Zang Did Not Know More Than Three Years Prior To Filing Suit That Defendant Failed To Properly Manage Plan Assets.

Zang also alleges that Paychex failed to properly manage funds for its clients' plans. (Compl. ¶¶ 44-57.)  For example, despite controlling tremendous sums of money, Paychex failed to aggregate pension plan assets to purchase lower cost share classes.  (*Id.* ¶ 55.)  Paychex also failed to "lower costs and increase investment returns for its client plans by offering equivalent, lower-cost mutual funds" (*id.* ¶ 56) and failed to "lower costs for its client plans" when it failed to "us[e] lower-cost pooled investment funds other than mutual funds."  (*Id.* ¶ 57.)  None of the documents that Zang signed reveal these facts.

## III.     PAYCHEX IS A FIDUCIARY BECAUSE IT CONTROLS PLAN ASSETS.

### A.     Function Is Key To Fiduciary Status.

ERISA defines a fiduciary as follows:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21), 29 U.S.C. § 1002(21). As the Sixth Circuit has oft-stated, "the definition of a fiduciary under ERISA is a functional one … and does not turn on formal designations such as who is the trustee."[11] Therefore, Paychex's belief that it is not a fiduciary because the documents that it drafted say so is "immaterial."[12] Indeed, if a person could simply draft a document with the magic words "I'm not a fiduciary" and thereby escape liability, ERISA would be eviscerated.

In other words, a person may function as a fiduciary regardless of what writings purportedly governing the plan say.[13] And disclaiming fiduciary status in various contracts that also purport to limit pension plan services to "ministerial" functions is not a free pass from fiduciary status if a person exercises functional control over plan assets. *IT Corp.*, 107 F.3d at 1419 (cited with approval in *Briscoe v. Fine*, 444 F.3d 478, 492-93 (6th Cir. 2006).)

---

[11] *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999); *see Mertens v. Hewitt Assoc.,* 508 U.S. 248, 262 (1993); *Briscoe*, 444 F.3d at 496.

[12] *Cf. Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 703 (W.D. Mich. 2007) (The test for fiduciary status is objective; a party's "belief that he is or is not a fiduciary is immaterial.")

[13] *See, e.g., IT Corp. v. Gen. Am. Life Ins. Co.*, 107 F.3d 1415, 1419 (9th Cir. 1997) ("putting the magic words in the contract, 'purely ministerial duties,' does not avoid fiduciary responsibility, if the characterization, 'purely ministerial duties,' is not correct."); *In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002, 1029-30 (S.D. Ohio 2006) (rejecting argument that plan documents established that defendants were not fiduciaries where plaintiffs alleged that defendants functioned as fiduciaries); *In re CMS Energy ERISA Litig.*, 312 F. Supp. 2d 898, 906-09 (E.D. Mich. 2004) (although plan documents named company as fiduciary, plaintiffs' allegations were sufficient at pleading stage to allege that individual defendants functioned as fiduciaries); *Rankin v. Rots*, 278 F. Supp. 2d 853, 872 (E.D. Mich. 2003) (argument that plan named company and not individual defendants as fiduciaries "misses the mark" because plaintiff alleged that individuals functioned as fiduciaries).

Moreover, "*any* authority or control" over plan assets confers fiduciary status whether or not the person exercises discretion. *See Briscoe*, 444 F.3d at 490-91 (distinguishing between phrases in section 3(21) that require "discretion" and those that simply require "control" to confer fiduciary status). As the Sixth Circuit observed, "[a] significant difference … is that discretion is specified as a prerequisite to fiduciary status for a person managing an ERISA plan, but the word 'discretionary' is conspicuously absent when the text refers to assets. This distinction is not accidental -- it reflects the high standard of care trust law imposes upon those who handle money or other assets on behalf of another." *Bd. Of Trustees Of Bricklayers And Allied Craftsmen Local 6 Of New Jersey Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 273 (6th Cir. 2001) (reversing trial court's ruling granting defendant's motion to dismiss). The distinction between discretionary authority and practical control may seem a fine one, but it is often critical. For example, in *Smith*, the Sixth Circuit held that a bank was a fiduciary even after it ceased being the plan's trustee. The bank removed stock shares from a plan participant's account to correct the bank's failure to purchase the same amount and type of stock shares for another client. 170 F.3d 612. The bank, the court held, retained its fiduciary status even after being removed as trustee, *i.e.*, even after losing its discretion, because it still "exercised control over plan assets" by removing such assets from a participant's account and then replacing those assets with a sum of lesser value. *Id.*; *see also Briscoe*, 444 F.3d at 492 (company was a fiduciary even after it terminated its relationship with plan because it continued to control some plan assets). Importantly, the Sixth Circuit distinguished between "practical control" and "mere possession or custody" of plan assets. *Id.* at 494. As discussed below, *see* Part II.C.1, *infra*, Zang has alleged that Paychex exercised practical control over Plan assets notwithstanding Paychex-drafted documents disclaiming fiduciary status.

16

**B.      Fiduciary Status Is A Fact-Intensive Inquiry Unsuitable For Disposition On A Motion To Dismiss.**

A motion to dismiss arguing against fiduciary status often is "a veiled attempt to obtain summary judgment at the pleading stage." *Rankin*, 278 F. Supp. 2d at 879. Stated differently, determining fiduciary status is a "fact-intensive inquiry"[14] and courts will "typically have insufficient facts at [the pleading] stage from which to make the law/fact analysis necessary to determine functional or named fiduciary status."[15] Not surprisingly then, courts generally deny motions to dismiss based where defendants have argued that plaintiffs' factual averments were insufficient to establish fiduciary status.[16] Indeed, all of the Sixth Circuit cases cited in support of Paychex's argument that it is not a fiduciary were decided on a motion for summary judgment.[17]

**C.      Paychex Is A Fiduciary Because It Controls Plan Assets.**

Fundamentally, Paychex is a fiduciary because it has the power to manipulate Plan assets for its own benefit. Specifically, (1) Paychex has some control over the selection of mutual funds available to the Plan and receives compensation from mutual funds in which the Plan

---

[14] *In re Cardinal Health ERISA Litig.*, 424 F. Supp. 2d 1002, 1030 (S.D. Ohio 2006) (quotation omitted); *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 213 (D. Conn. 2007); *Eslava v. Gulf Tel. Co.*, 418 F. Supp. 2d 1314, 1322 (S.D. Ala. 2006); *Woods v. Southern Co.*, 396 F. Supp. 2d 1351, 1365 (N.D. Ga. 2005).

[15] *In re Elec. Data Sys. Corp. ERISA Litig.*, 305 F.Supp.2d 658, 665 (E.D. Tex. 2004); *see also Spano v. Boeing Corp.*, 2007 WL 1149192 , *3 (S.D. Ill. 2007) (determining "whether or not a person exercises control and has discretion with respect to plan assets so as to be considered a fiduciary within the meaning of ERISA is a factual one, singularly ill-suited to resolution on a challenge to the legal sufficiency of the complaint.") *see Smith v. AON Corp.*, 2006 WL 1006052, *4 (N.D. Ill. 2006) (to same effect); *Chao v. N.J. Licensed Beverage Ass'n*, 461 F.Supp.2d 303, 308 (D.N.J. 2006) (same)**;** *see also Woods*, 396 F. Supp. 2d at 1365 (collecting cases).

[16] *See In Re Cardinal Health*, at 1430; *In re CMS Energy ERISA Litig.*, 312 F.Supp.2d 898, 907-09 (E.D. Mich. 2004) (holding that fiduciary status could not be determined on a motion to dismiss); *Ellis v. Rycenga Homes, Inc.*, 484 F. Supp. 2d 694, 703 (W.D. Mich. 2007) (same); *Roofers Loc. 149 Sec. Ben. Trust Fund v. Milbrand Roofing Group*, 2007 WL 835802 (E.D. Mich. 2007) (deciding fiduciary status on motion for summary judgment); *Operating Eng's Local 324 Pension Fund v. Midstates Contractors, LLC*, No. 04-73052, 2007 WL 496706 (E.D. Mich. 2007) (same).

[17] *See generally Briscoe*, 444 F.3d 478; *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499 (6th Cir. 2004); *Seaway Food Town, Inc., v. Med. Ass'n of Ohio*, 347 F.3d 610 (6th Cir. 2003); *DeLuca v. Blue Cross Blue Shield of Mich.*, No. 06-12552 (E.D. Mich. Oct. 31, 2007).

invests (Compl. ¶¶ 33-34, 39, 69-70; Paychex Exs. E at 3, part V.A, and G at 4, ¶ 19);

(2) Paychex controls how long Plan assets are held in a pooled trust account before those assets

are invested in mutual funds and receives earnings from the trust account based on how long

Plan assets are held therein (Compl. ¶¶ 13, 71-72; Paychex Ex. A at 30, part II.D); and

(3) Paychex has pledged Plan assets as collateral for lines of credit issued to Paychex (Annual

Report at 21-22).  In addition, Paychex advises its clients on selecting mutual funds.  (*See*

Paychex Ex. D at 2).

Paychex relies in large measure on a 1997 Department of Labor Advisory Opinion (DOL

Adv. Op. 97-16A (May 22, 1997) ("Aetna Letter")) to argue that it is not a fiduciary where it

controls the menu of mutual funds from which client plans make their investment selections.

(Memo at 13-15.)  An advisory opinion, however, "lacks the force of law."  *Phones Plus, Inc. v.*

*The Hartford Fin. Servs. Group, Inc.*, 2007 WL 3124733, *4 (D. Conn. 2007) (quotations

omitted).  It is "issued in response to a 'specific factual situation, applies only to the situation

described,' and may be relied on 'only by the parties described in the opinion and then only to

the extent that the situation conforms to the situation described in the request.'"  *Id.* (quoting

ERISA Procedure 76-1 §§3, 10, 41 Fed. Reg. 36281 (Aug. 27 1976).  Here, neither the situation

described nor the parties are the same.

As the *Phones Plus* court noted, the Aetna Letter assumes that the revenue-sharing

payments from the mutual funds are (1) for record-keeping and other services to the mutual

funds, (2) that the revenue-sharing payments are fully disclosed, (3) that proper notice in any

changes to the mutual fund line-up will be provided to plan sponsors or trustees, and (4) that the

plan will have a 120-day window to opt-out of changes to the mutual fund line-up.  2007 WL

3124733, *4.  The court then contrasted the assumed facts of the Aetna Letter to those alleged by

the plaintiff:  (1) the revenue-sharing payments collected by the defendant were redundant and excessive, (2) the defendant's disclosures about the revenue-sharing payments were misleading, (3) the notification procedures regarding mutual fund changes were not described in the parties' contract, and (4) the plan only had a 30-day window to opt-out of changes to the mutual fund line-up.  *Id.*

Zang alleges facts very similar to those alleged by the plaintiffs in *Phones Plus*.  Zang alleges that (1) the revenue sharing payments caused Paychex to be paid twice for the same service and resulted in excessive costs to the Plan (Compl. ¶¶ 8, 10; *see* Factual Summary Part C, *supra*), (2) Paychex did not disclose the amount of the revenue sharing payments (Compl. ¶¶ 11, 35) or that it increased its revenue-sharing receipts from 30 basis points in 2005 to 40 basis points in 2006 (Compl. ¶ 70), (3) Paychex misrepresented that the revenue sharing payments were for services to the Plan and the mutual funds when, in fact, the payments were Paychex's pay-off for including mutual funds on the menu provided to pension plan clients (Compl. ¶¶ 8, 59), (4) the original administrative services agreement between the parties did not describe any, let alone "extensive," notification procedures when Paychex changes a mutual fund (*see* Paychex Ex. At 30-33), and (5) the subsequent administrative services agreements provided only a 60-day-opt out window if Paychex changed a mutual fund (*see* Paychex Exs. E at 3, Part V.A, and Ex. G at 4, ¶ 19).  The differences between Zang's allegations and the facts assumed by the Aetna Letter, thus, are no less striking than the differences described by the *Phones Plus* court, who stated that the "differences render moot whatever persuasive power the [Aetna Letter] opinion might have carried."  2007 WL 3124733, *4.

Like *Phones Plus*, *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156 (D. Conn. 2006), supports Zang's claims here.  Under the contracts at issue in *Nationwide*,

Nationwide Financial Services, Inc. ("Nationwide") selected the mutual fund investment options that were made available to its client plans. The plans choose from the menu of mutual funds provided by Nationwide. And Nationwide could change the line-up of mutual funds. 419 F. Supp. 2d at 161. Nationwide purportedly contracted with the mutual funds to provide services to the funds and received revenue sharing payments for providing those services. *Id.* at 161-62. The plaintiffs offered evidence (after discovery) that the services provided to the mutual funds were the same services that Nationwide had always provided to its pension plan clients and that the payments to Nationwide were based on how much its client plan assets had invested in the mutual funds as opposed to compensation for services performed. *Id.* at 162-63. Based on these facts and viewing the evidence in the light most favorable to plaintiffs, the court held that a reasonable fact finder could conclude that the service agreements between Nationwide and the mutual funds "were a guise for making payments to Nationwide," that Nationwide "provided only nominal services [to the mutual funds] and the payments were not for those services," and that the "purported service contracts were a means for Nationwide to collect payments from mutual funds in exchange for offering the mutual funds as investment options" to its pension plan clients. *Id.* The court added that the evidence supported a finding that Nationwide was a fiduciary where it exercised "some control over the selection and offering of particular mutual funds as investment options" for client plans. *Id.* at 165.

Zang, of course, has not had the benefit of discovery of the contracts between Paychex and various mutual funds; the only evidence before the Court is that selected by Paychex. Zang has alleged, however, that (1) the revenue sharing payments caused Paychex to be paid twice for the same service and resulted in excessive costs to the Plan (Compl. ¶¶ 8, 10; *see* Factual Summary Part C, *supra*), (2) Paychex did not disclose the amount of the revenue sharing

payments (Compl. ¶¶ 11, 35), and (3) the payments were Paychex's pay-off for including mutual funds on the menu provided to pension plan clients, not payment for services provided to the mutual funds (Compl. ¶¶ 8, 59; *see also* Factual Summary, Part C.)  These fact allegations must be accepted as true and more than make the case that Paychex functioned as a fiduciary.

Paychex attempts to distinguish *Phones Plus* and *Haddock* on the basis that the fiduciary status in those cases "turned on [the defendant's] authority to delete or substitute the mutual funds that its clients had selected, not on the [defendant's role] in establishing the initial line up of investment options."  (Memo at 17.)  But Paychex's own exhibits belie that distinction:  they say that Paychex has the authority to delete or substitute the mutual funds available to the Plan.  (*See* Paychex Exs. E at 3, part V.A, and G at 4, ¶ 19.)  Moreover, Zang's allegations that Paychex controls which mutual funds are made available to its client plans (*see* Compl. ¶¶ 33, 39, 59) must be construed to include control over the available mutual funds before and during the relationship with the Plan.

Paychex also argues that the mere receipt of payments from mutual funds (Memo at 18-22) and banks (Memo at 22-23) that hold Plan assets does not make Paychex a fiduciary.  True enough.  As discussed in Part III.A, *supra*, above, it is control over Plan assets that makes Paychex a fiduciary.  As the foregoing discussion of the Aetna Letter, *Phones Plus*, and *Nationwide* explains, Paychex controls Plan assets by controlling which mutual funds are made available to its client plans.  But Paychex also controls Plan assets in other ways.

First, Paychex has control and discretion over how long Plan assets remain in a Master Trust Account pending investment in mutual funds (Compl. ¶ 72; Paychex Ex. A at 30, Part II.D) and Paychex receives earnings from Plan assets pending investment in the mutual funds that Paychex chooses to make available to those clients who adopt its Prototype Plans (Compl. ¶¶ 13,

71).  Thus, Paychex can use its discretion and control over Plan assets in the Master Trust

Account to increase earnings for Paychex at the expense of the Plan.  This is in marked

distinction to arrangements discussed by the authorities cited by Paychex because the exercise of

control by Paychex can reduce Plan earnings:  every day that Plan assets remain in the Master

Trust Account is a day that the Plan is not earning on those assets.

     None of the cases cited by Paychex involved allegations of such discretion and control

over plan assets by a defendant.[18]  The first two cases (*Seaway Food* and *Chicago Dist. Council*),

involved health insurance programs where the plaintiffs contracted to pay a certain price for

health benefits and the contracts expressly provided that the defendants could keep any

discounts.  In other words, no matter how deep the discount or rebate obtained by the insurer, the

plaintiffs' costs were the same.  Here, however, if Paychex keeps Plan assets in the Master Trust

Account one day longer than necessary, the Plan foregoes investment opportunities and Paychex

benefits.

     In *DeLuca*, the defendant's alleged breach involved negotiating a higher price from

providers under two of defendant's insurance programs in order to receive lower rates on

defendant's third type of program.  The plaintiff, who had a contract under one of the two

programs for which the rates were raised, was contractually obligated to reimburse defendant

whatever defendant paid to the providers.  The plaintiff alleged that the defendant acted as a

fiduciary with regard to plan assets.  The court rejected that argument, noting that the payment

from plaintiff to defendant was nothing more than a pre-existing contractual duty and did not

entail in any sense defendant's control of plan assets.  Here, the situation is different.  Paychex

---

[18] *See Seaway Food Town, Inc., v. Med. Mut. of Ohio*, 347 F.3d 610 (6th Cir. 2003); *Chicago Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463 (7th Cir. 2007); *DeLuca v. Blue Cross Blue Shield of Mich.*, No. 06-12552, 2007 WL 3203131 (E.D. Mich. Oct. 31, 2007).

keeps Plan assets in the Master Trust Account.  If Paychex keeps those assets in that Account one day longer than necessary, the Plan foregoes investment opportunities and Paychex benefits. That is the type of discretion and control that was lacking in the authorities cited by Paychex.

Second, Paychex controls Plan assets by pledging those assets as collateral for lines of credit issued to Paychex.  *See* Factual Summary Part D.  That is plainly control over pension plan assets.  Here Paychex pledged the assets of its plan clients, as security for a loan to Paychex, not a loan to, or merely for the benefit of, its client plans.  None of the documents submitted by Paychex in support of its motion permit this conduct.  Thus Paychex acted as the classic ERISA fiduciary, managing and controlling pension plan assets.

## **CONCLUSION**

For all the foregoing reasons, the Court should deny Paychex's motion to dismiss.


Dated: November 30, 2007                    Respectfully submitted,


   /s/ Gregory Y. Porter   
J. Brian McTigue (D.C. Bar No. 475904)
Gregory Y. Porter (D.C. Bar No. 458603)
McTIGUE & PORTER LLP
5301 Wisconsin Avenue, NW
Suite 350
Washington, DC 20015
Tel: (202) 364-6900
Fax: (202) 364-9960

Barry D. Adler (P30557)
Adler Stillman, PLLC
30300 Northwestern Highway, Suite 304
Farmington Hills, MI 48334
Tele: (248) 855-5090
Fax: (248) 932-4009

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically with the Court this 30th day of November 2007 and that copies were served the same day via the Court's ECF notification system upon the following:

**Thomas G. McNeill**
Dickinson Wright
500 Woodward Avenue
Suite 4000
Detroit, MI 48226-3425
313-223-3500
TMcNeill@dickinsonwright.com

**Barry D. Adler**
Adler and Associates
30300 Northwestern Highway
Suite 304
Farmington Hills, MI 48334
248-855-5090
badler@adlerfirm.com

David T. Bond
McTigue & Porter LLP